UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JEDIDIAH SHOEMAKER,<br><br>    Petitioner,<br><br>vs.<br><br>ERIC ARNOLD, Acting Warden,[1]<br><br>    Respondent. | Case No: C 11-2674 SBA (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

In 2008, Petitioner Jedidiah Shoemaker was convicted following a jury trial in the Contra Costa County Superior Court of voluntary manslaughter, Cal. Penal Code § 192(a).[2] The jury found true a firearm allegation and the trial court found true an allegation that Petitioner had suffered a prior strike conviction under California's Three Strikes law.

This matter is now before the Court for consideration of Petitioner's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("Amended Petition"). Petitioner asserts the following claims: (1) the trial court violated Cunningham v. California, 549 U.S. 270 (2007), by imposing an upper term sentence; (2) the prosecutor committed prejudicial misconduct; and (3) the trial court improperly denied his motion under People v. Superior Court (Romero), 13 Cal.4th 497, 529-530 (1996) ("Romero"), and abused its discretion in sentencing him under California's Three Strikes law.  Dkt. 16 at 7.[3]

---

[1] Eric Arnold, the current acting warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Unless otherwise noted, all further statutory references are to the California Penal Code.

[3] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Petitioner.

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Amended Petition for the reasons set forth below.

## I. BACKGROUND

### A. STATEMENT OF FACTS

The following facts are taken from the unpublished opinion of the California Court of Appeal ("Court of Appeal" or "state appellate court"):

> *A. Prosecution Case*
>
> Defendant was at the home of Kinara Herron in Bay Point on the evening of November 27, 2006. Several other people were also there, including Herron, Richie Asidanya, Clay Ward, and Miguel Plaza. Some of them were "rapping" after dinner and having a good time. Plaza described the atmosphere at the house as "a little dangerous," and said that some of the people there had "a reputation." Plaza noticed that defendant did not "fit in," and that although he had originally been friendly, he became quiet and had a "nasty face" after the others began rapping, although no one had been arguing with him. As the group was writing rap lyrics, defendant pulled up his shirt, took out a gun, and shot Herron in the head. Afterward, he ran out of the house.
>
> The other people at the house gave conflicting testimony about who was in the room when defendant shot Herron. Plaza testified that Asidanya was in the room at the time; Asidanya testified that he was outside smoking a cigarette and did not see the shooting. Ward also testified, apparently referring to himself and Asidanya, that "[w]e was outside the house smoking a cigarette when it happened." However, Herron's mother, Sheryl Herron, testified that several months after the killing, Ward told her that as the group was writing rap songs and listening to music, defendant suddenly pulled out a gun and started shooting Herron, that he had a "weird look on his face," and that the others "took off running" for fear that defendant would shoot them as well. Asidanya also told Herron's mother that he was present when Herron was killed, that defendant took out a gun and started shooting, firing more than once, that Herron "'didn't see it coming,'" that defendant had a strange look on his face, and that Asidanya ran away so fast he ran out of his shoes.
>
> Herron was taken to the hospital, where he died, apparently on the following day. An autopsy revealed that he had received four separate gunshot injuries, to his head, chest, knee, and hand respectively.
>
> The Contra Costa County Sheriff's Department searched for defendant, and eventually found and arrested him in February 2007.

### B. Defense Case

In his own defense, defendant testified that he and Herron had known each other since childhood, and he was spending Thanksgiving weekend at Herron's house. While he was at the house, he saw "a lot of drugs, a lot of drinking, a lot of weed," and drugs were being sold. He testified that although the atmosphere at the Thanksgiving celebration had been "cool," the atmosphere had changed on the evening of the Monday after Thanksgiving, the day of the shooting. At that time, the atmosphere was "cloudy" and there was "a little tension in the air." He and some of the others played dominoes, and Asidanya was talking an "excessive amount," "talking shit," and defendant "felt kind of weird." When Asidanya started "saying the rap," he moved toward defendant and was "all in [his] face," saying in his rap, "'You got guns. We got guns too.'" As he did so, Asidanya lifted his coat, and defendant saw a gun. Asidanya reached for the gun, then turned around and walked back around the table. Defendant looked at Herron, as if to ask what was going on, and Asidanya pulled out his gun, then sat down, the gun on the table and his hand on the gun. Defendant saw Ward and Plaza "reaching and clutching like they was going to pull something out," and Asidanya nodded at them. Defendant testified, "[W]here I am from you don't pull guns out and don't use them," and he pulled out his own gun and started shooting while he ran for cover behind a wall, shooting in the general direction of the others. He described himself as "spooked," "shocked," and "in fear," and he shot because he feared for his life. He stopped shooting when the others ran. Herron fell, and defendant ran away.

Defendant testified that he carried a loaded gun because he had heard that some people in Sacramento wanted to rob him, and that in the lifestyle he led "in the streets," "you never know what's going to happen." He had gotten $2,500 the day he shot Herron, and believed the others might have intended to rob him.

Defendant introduced evidence that Asidanya had a reputation for violence and for carrying a gun; that he had been seen with a "silver weapon" that looked like a gun in the past; that when a witness had accused him of burglarizing his house, Asidanya had told him, "'I will come back and take care of you and [the witness's family],'" and "'you better watch your step from now on mother fucker,'" and had threatened to shoot him.

A former girlfriend, Nicole Singleton, testified that after Herron's death, defendant told her someone had pulled a gun out and put it on his lap, and indicated he had reacted by shooting a gun. On cross-examination, Singleton testified that after a friend of defendant's named George was murdered, defendant's personality changed, he acted "weird" and was "really, really sad," that he began using drugs, and that on one occasion he "'jumped on [her]'" and beat her up. She acknowledged having told an investigator that during a period

3

> that she lived with defendant, in May 2006, defendant was "paranoid," although when asked to elaborate, she described defendant as "not paranoid, just cautious, cautious of his surroundings, you know, thinking maybe people might want to hurt him or do something to him, but not, not paranoid, just cautious."
>
> During the defense case, Asidanya testified again, and denied ever carrying firearms. He also testified that he did not speak to defendant; that he did not say to him, "'You've got a gun. I've got a gun too'"; that he did not take out a gun and put it on a table on the evening of the shooting; and that to his knowledge no one other than defendant had a gun that evening.

People v. Shoemaker, No. A121529, 2009 WL 4190182, *1-2 (Cal. Ct. App. Nov. 25, 2009) (footnote omitted).

### B. CASE HISTORY

The jury found defendant not guilty of murder, but guilty of the included offense of voluntary manslaughter under § 192(a), and found true a firearm allegation. Prior to sentencing, Petitioner filed a Romero motion to dismiss his prior strike conviction, which the court denied. The trial court sentenced Petitioner to a total term of twenty-seven years in prison, based on the upper term of eleven years, doubled pursuant to § 1170.12(c)(1); four years for the firearm enhancement, id. § 12022.5(a); and one year for a prior prison term, id. § 667.5.

Petitioner appealed the judgment to the Court of Appeal contending that the trial court abused its discretion in sentencing him, the prosecutor committed prejudicial misconduct, and the trial court abused its discretion in denying his Romero motion. Id. at *1, 9. In an unpublished opinion, filed on November 25, 2009, the state appellate court affirmed the judgment. Id. at 10, Resp't Ex. 4. Petitioner then filed a petition for review with the California Supreme Court, raising his claims on direct appeal, except for the prosecutorial misconduct claims. Resp't Ex. 5. The state supreme court denied the petition for review on February 3, 2010. Dkt. 16 at 64.

On June 3, 2011, Petitioner filed his original Petition. Dkt. 1. On May 4, 2012, the Court stayed the instant habeas proceedings to allow Petitioner to exhaust state judicial remedies as to his unexhausted prosecutorial misconduct claims. Dkt. 13. This case was

administratively closed pending Petitioner's receipt of a final decision from the highest state court. He then moved to re-open the action, lift the stay, and amended the stayed petition to add the newly-exhausted prosecutorial misconduct claims.

The California Supreme Court denied Petitioner's state habeas petition on June 27, 2012. Dkt. 16 at 65. Thereafter, Petitioner filed his Amended Petition. Dkt. 16. The Court granted Petitioner's implied motion to lift and amend the stayed petition to add his newly-exhausted prosecutorial misconduct claims. Dkt. 25. On February 22, 2013, the Court issued an Order to Show Cause why the writ should not be granted. Dkt. 22. Respondent has answered the Amended Petition. Dkt. 26. Although he was given an opportunity to do so, Petitioner has failed to file a Traverse. Briefing is now closed and the petition is ripe for adjudication.

## II.     LEGAL STANDARD

The instant Amended Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted). Relief under the "unreasonable application" clause is appropriate "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Habeas petitioners bear the burden of showing that a state court's decision applied some Supreme

Court precedent in an objectively unreasonable manner. Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

If constitutional error is found, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining [the] jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court. See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). The last reasoned decision in this case is the Court of Appeal's unpublished disposition issued on November 25, 2009.

### III. DISCUSSION

#### A. CUNNINGHAM CLAIM

Petitioner claims that the trial court violated Cunningham and abused its discretion by imposing the upper term for his offense on the basis of facts found by a judge and not a jury. The California Court of Appeal rejected Petitioner's claim, concluding that the trial court explained its reasons for imposing the upper term, which was sufficient to support the sentence:

> The trial court explained its reasons for exercising its sentencing discretion in this manner as follows: "From my perspective the crime did involve great violence with four shots having been fired. Actually, more than four shots, but four from my perspective directed at a single person, *undermining a representation that a person of Mr. Shoemaker* [sic] *was acting in self-defense against other people in the household at that time*. [¶] . . . [¶] And his very possession of the firearm is suggestive of an intent which arose before the firing of the shots. [¶] In other words, that *it was not the actions of the other people in the household that at that moment provoked Mr. Shoemaker to act*." (Italics added.) As additional bases for its decision to impose the upper term, the trial court indicated that the crime showed sophistication, that defendant's convictions as an adult were numerous and of increasing seriousness, that he was on probation at the time of the crime, and that his performance on probation was unsatisfactory. The court stated that it would impose the upper term on the basis of any one of these factors.

Shoemaker, 2009 WL 4190182, *7 (italics in original). The state appellate court further stated that the jury's verdict did not imply rejection of the evidence that Petitioner had not acted in imperfect self-defense or under provocation, but only that those facts had not been proved beyond a reasonable doubt. Id. at *9. Thus, the court determined that, under the circumstances, the trial court "could properly take into account the evidence related to the shooting when selecting the appropriate sentence." Id. The court concluded that "[t]he presence of a single proper aggravating circumstance is sufficient to support the imposition of the upper term." Id.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury. U.S. Const. amend. VI. The Supreme Court's Sixth Amendment jurisprudence was significantly expanded by Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny, which extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations in addition to the fact finding on the actual elements of the crime. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. In Blakely v. Washington, the Supreme Court held the "statutory maximum" for Apprendi purposes is

the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings.  542 U.S. 296, 303-04 (2004).  In Cunningham, the Supreme Court held California's determinate sentencing law ("DSL"), which authorized a judge, rather than a jury, to find facts exposing a defendant to an enhanced sentence, violated a defendant's Sixth Amendment right to trial by jury.  549 U.S. at 288-89.  In so concluding, the Supreme Court relied on its previous decision in Apprendi.  Id.

At the time Cunningham was decided, California's DSL, pursuant to former California Penal Code § 1170, provided a determinate sentencing scheme comprised of a lower, middle and upper term, with a required imposition of the middle term unless the court found aggravating or mitigating factors.  Cunningham deemed the middle term the "statutory maximum" term, and it proscribed a sentencing scheme that permitted a court to impose a higher sentence based upon a fact, other than a prior conviction, not admitted by the defendant nor found true by the jury.  549 U.S. at 288.  Essentially, Cunningham applied Blakely to strike down California's DSL.  See Creech v. Frauenheim, 800 F.3d 1005, 1015 (9th Cir. 2015).

On March 30, 2007, in response to the Supreme Court's suggestion in Cunningham, 549 U.S. at 293-94, that California could cure any constitutional defect in § 1170(b) by leaving the selection of an appropriate sentence to the judge's discretion, the California Legislature enacted Senate Bill 40, which amended § 1170(b).  See Cal. Stats. 2007, ch. 3 (S.B. 40), § 3, eff. Mar. 30, 2007.  Under amended § 1170(b), a trial court still exercises its discretion in selecting among the upper, middle or lower terms, but no additional fact finding is required to impose an upper or lower term.  See Butler v. Curry, 528 F.3d 624, 652 n.20 (9th Cir. 2008).

Here, the trial court sentenced Petitioner in 2008—after the May 30, 2007 effective date of the amendment to § 1170(b).  The applicable law at sentencing therefore was

California's amended sentencing scheme, which this Court finds complies with Cunningham, as applied to Petitioner. See Creech, 800 F.3d at 1015. Specifically, under amended § 1170(b), the trial court was not required to find an additional fact in order to impose the upper term sentence. See id. ("imposition of the lower, middle, or upper term is now discretionary and does not depend on the finding of any aggravating factors"). In fact, because the upper term at the time of Petitioner's sentencing was the "statutory maximum" within the meaning of Cunningham, the trial court was permitted to rely on facts in addition to those found by the jury in the exercise of its discretion. See United States v. Booker, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.").

Habeas relief is further precluded by § 2254(d). In Cunningham, the Supreme Court acknowledged that several states had modified their sentencing schemes in the wake of Apprendi and Blakely to permit judges broad discretion within a statutory range, "which 'everyone agrees' encounters no Sixth Amendment shoal." Cunningham, 549 U.S. at 294 (quoting Booker, 543 U.S. at 233). Cunningham left "the ball . . . in California's court" to revise its system accordingly. Id. at 293-94 (citation and brackets omitted). And, as explained above, the California Legislature did exactly that by amending section 1170(b).

In view of California's decision to follow Cunningham's suggested sentencing scheme in order to avoid a Sixth Amendment violation, the state appellate court's rejection of Petitioner's Sixth Amendment claim under such sentencing scheme cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d). Put simply, Petitioner fails to show that there was "no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011). Accordingly, this claim is DENIED.

**B.    PROSECUTORIAL MISCONDUCT**

Petitioner contends that the prosecutor committed prejudicial misconduct by: (1) mischaracterizing Petitioner's testimony; (2) cross-examining Petitioner's former

girlfriend, Nicole Singleton, about the death of his friend, George; (3) cross-examining Petitioner regarding his failure to discuss his defense prior to the trial; and (4) appealing to the jury's sympathy for the victim and his family. The state appellate court rejected all the aforementioned claims of prosecutorial misconduct. Shoemaker, 2009 WL 4190182, *3-*6.

A claim of prosecutorial misconduct is not cognizable in federal habeas corpus proceedings unless the misconduct renders the trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986). "[U]nder Darden, the first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness." Tak Sun Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). But "[a] determination that the prosecutor's questioning was improper is insufficient in and of itself to warrant reversal." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998). "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). Additionally, under AEDPA, a federal habeas court examines only whether the state court's application of these principles was unreasonable. Brown v. Payton, 544 U.S. 133, 143 (2005). In the event a constitutional error occurred, habeas relief will be denied unless the error had a substantial and injurious effect or influence on the jury's verdict. Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).

   **1.**  **Background**

     ***a)***  ***Mischaracterization of Petitioner's Testimony***

Petitioner's first prosecutorial misconduct claim stems from his testimony that on or after January 15, 2007, while he was still evading the police, he called his girlfriend Singleton a number of times and asked to meet her at a park, then stayed with her for a few days. During Petitioner's cross-examination by the prosecutor, the following exchange took place:

> Q. Now, Mr. Shoemaker, Ms. Singleton was afraid of you, correct?

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | No, she wasn't afraid of you? |
| 3 | A. | No. |
| 4 | Q. | She wasn't afraid of you because of your past violent behavior with her? |
| 5 | | |
| 6 | A. | No. |
| 7 | Q. | She wasn't afraid of you because you would get weird and paranoid when you were using drugs? |
| 8 | A. | No. I've always been like that. You got to be cautious when you are out there on the streets. I'm always like that. |
| 9 | | |
| 10 | Q. | I mean, not to make light of what you've just said, so, "I've always been weird and paranoid," not just when you are using drugs? |
| 11 | | |
| 12 | A. | Not paranoid, I've been cautious. |

Shoemaker, 2009 WL 4190182, *3. Petitioner contends the prosecutor mischaracterized this testimony later in the cross-examination:

> In questioning him about the events immediately before the shooting, the prosecutor said, "Q. You are standing there just watching Kinara as he's hanging out with his guys having a good time, just rapping and you're getting mad. Just like you said earlier, even if you are not doing drugs you get paranoid and weird? [¶] . . . [¶] Q. And you stood there watching these friends having fun." The trial court overruled an objection, and Petitioner answered, "No, . . . I wasn't mad at that time. No." Shortly afterward, in cross-examining defendant about whether he took responsibility for his past parole violations and his conduct during a previous prison term, the prosecutor asked, "And in your own words, you get a little weird and a little paranoid and you perceive that you are being disrespected when that's not even happening; isn't that true?" The trial court overruled an objection, and defendant responded, "Not even true. It's not. No." Finally, challenging defendant on his position that the atmosphere in Herron's house before the shooting was tense, the prosecutor asked: "Q. You said that everything changed, that it seemed tense in the house after you returned the night that Kinara was murdered? [¶] A. Right. [¶] Q. Isn't it true the only thing[s] that changed in that house were your perceptions? [¶] A. No. [¶] Q. That you became paranoid that you were being disrespected, that people were clowning you and that Kinara wasn't sticking up for you? [¶] A. No. [¶] Q. Isn't it true that the reason your perception changed that night from the house being a calm, warm, friendly place, that people would come to socialize, isn't it true that your

11

>perceptions changed because you were paranoid either from whatever personality issues you have or from doing cocaine? [¶] No."

Id.

On appeal, Petitioner did not challenge the prosecutor's entire line of questioning, as set forth above. Instead, Petitioner claimed that the prosecutor improperly mischaracterized the above-referenced testimony by indicating that Petitioner had testified that he became "weird and paranoid" before the shooting or when using drugs. Id. The state appellate court disagreed, finding that "at least one of [Petitioner's] responses could reasonably be interpreted to indicate that he did in fact become 'weird and paranoid'" during one of those instances. Id. For example, "When asked if he got weird and paranoid when using drugs, [Petitioner] initially responded, 'No I've always been like that. You got to be cautious when you are out there on the streets. I'm always like that.'" Id. The state appellate court also found that even if it had agreed with Petitioner, it would have rejected his claim on the ground that he failed to show prejudice as "the jury heard other testimony describing [him] as both 'weird' and 'paranoid' and indicating that he used drugs." Id.

### *b)* *Cross-examination Regarding Previous Events*

Petitioner next contends that the prosecutor committed misconduct while cross-examining Singleton regarding the death of Petitioner's friend, George. The state appellate court summarized the factual background as follows:

>The prosecutor asked Singleton, "Do you remember that a friend of Mr. Shoemaker's knew [sic] George was murdered in Sacramento?" Singleton replied, "Yes," and the prosecutor began her next question: "And the word on the street was—" Defense counsel objected, and outside the presence of the jury, requested a mistrial, contending the prosecutor's question suggested to the jury that defendant had murdered George. The trial court denied the motion, concluded the prosecutor had not committed misconduct, and refused to admonish the jury. In response to the prosecutor's next reference to the murder of George, Singleton testified that she did not know he was murdered. The prosecutor went on to elicit testimony that after George's death, Singleton noticed that defendant's personality had changed, that he was acting weird, and that he had begun to use drugs. In later argument on the issue outside the jury's presence, the trial court stated, "from the questions that were asked, this jury has not received any information from which it could come even close to drawing [the] inference" that

12

defendant was responsible for George's death.

Id. at *4.  The state appellate court agreed with the trial court that the references to George's death did not suggest to the jury that Petitioner murdered him.  Id.  Thus, the state appellate court found there was no basis to conclude the jury would interpret the cryptic reference to "the word on the street" to mean that Petitioner had killed George or that Petitioner's behavior after the death of a friend was attributable to consciousness of guilt.  Id.  Therefore, the state appellate court determined that the trial court "properly concluded that the prosecutor did not commit misconduct in this line of questioning."  Id.

### c)    *Cross-examination on Pre-arrest Silence*

Petitioner contends that the prosecutor improperly commented on Petitioner's failure to reveal his defense before trial, and more specifically, his prearrest silence.  Id.  While cross-examining Petitioner, the prosecutor asked, "This is the first time that you've told this story about anyone else in Kinara's house having a gun."  Id.  Petitioner objected, and outside the presence of the jury, the trial court overruled the objection.  However, the court directed the prosecutor to make clear that her line of questioning was limited to the period before Petitioner was apprehended.  Id.  The prosecutor then elicited Petitioner's testimony that he had not called either the Contra Costa County Sheriff's Department, a police department, or Herron's family after the shooting to tell them he had acted in self-defense.  Id.  In doing so, Petitioner claims that the prosecutor committed misconduct.

In analyzing this claim, the state appellate court noted that in California, a criminal defendant's silence after a Miranda warning may not be commented upon.  Id.  (citing People v. Free, 131 Cal. App. 3d 155, 165 (1982)).  However, the state court added: "[*p*]*rearrest* silence may be commented upon unless the court finds the silence was an invocation of Fifth Amendment rights.  Prearrest silence in circumstances in which there is no inference of a reliance on the right to silence may be used to impeach by way of cross-examination."  Id. (citing Free, 131 Cal. App. 3d at 165) (italics added); People v. Burton, 117 Cal. App. 3d 382, 385-387 (defendant's prearrest failure to explain incident in question properly used to impeach testimony that he acted in self-defense)).  Relying on the

13

aforementioned line of authority, the state appellate court rejected Petitioner's claim upon finding that the use of a Petitioner's pre-arrest, pre-Miranda silence is permissible as *impeachment* evidence, stating:

> The issue before us is not a defendant's right to withhold alibi evidence while awaiting trial, but whether his prearrest silence may be used to impeach the credibility of his testimony that he acted in self-defense. In these circumstances, we conclude that the holdings of Free and Burton are applicable, and that the prosecutor did not act improperly in impeaching defendant with his failure to contact law enforcement officers after the killing to tell them he had acted in self-defense.

Id. at *5 (citing Free, 131 Cal. App. 3d at 165 and Burton, 117 Cal. App. 3d at 385-387).

### *d)* *Appeals to Sympathy for Victim and Family*

Finally, Petitioner contends the prosecutor improperly appealed to the jury's sympathy for the victim, Herron, and his family. The state appellate court summarized the factual background as follows:

> A friend of Herron, Steve Serna, testified as a witness for the defense that on November 30, 2006, two sheriff's deputies asked him if Herron's family knew where defendant was, and Serna told them the family would not give them any information and that it would handle the matter itself. On cross-examination, Serna testified that he went to the hospital after Herron was shot, and that he saw members of Herron's family there. The prosecutor asked how long Herron had lived before being taken off life support, and Serna testified Herron had lived "maybe" three or four days. The prosecutor asked whether he had had much contact with Herron's family during that time, and he responded in the affirmative, and when asked, said he had not heard any family member threaten to kill defendant. Asked his opinion of Herron's family, he testified that it was "one of the most loving families" he had ever met. Asked his opinion of the suggestion, made in direct examination, that Herron's family planned to have defendant killed, Serna testified that it was "far-fetched" and contrary to what he knew of the Herron family.

14

Shoemaker, 2009 WL 4190182, *5. The state appellate court disagreed that the prosecutor improperly appealed to the jury's sympathy for Herron and his family in eliciting the aforementioned testimony, stating as follows:

> In context, this cross-examination was a fair attempt to explore the basis for defendant's suggestion, raised during direct examination of Serna, that members of the Herron family did not cooperate with law enforcement officers after the shooting because they intended to have defendant killed. The prosecutor's questions were directed not at exploiting the jury's sympathy for Herron and his family, but at determining how much time Serna had spent with Herron's family after the shooting and whether they had indicated they were likely to act as defendant suggested. There was no impropriety.
>
> We also reject defendant's challenges to certain statements the prosecutor made in her rebuttal argument. During defense counsel's closing argument, she told the jury that Herron had been convicted of armed robbery and of being a felon with a firearm, that he had served time in state prison, and that defendant should not be seen as "a snake that entered the [G]arden of Eden and everything was lovely before that." Without discounting the importance of Herron's death or his family's suffering, she argued, the jury should consider that defendant was "a man among similar men." In rebuttal, the prosecutor argued that defense counsel was "attempting to victimize Kinara Herron again," and asked, "How do you think his family has felt sitting through this?" She stated that Herron's character was not at issue, and went on, "Kinara Herron never had the opportunity to come into this courtroom and testify to you. You have no idea what kind of changes he had made in his life, the businesses he had started, the fact that he had applied to college. You had no idea of that. You have no idea what kind of a person he was. You haven't even been allowed to see a photograph of him." Defense counsel objected to any commentary on the court's rulings, and the court reminded the jury that statements of attorneys were not evidence. Shortly thereafter, the prosecutor argued, "[N]ot only has [Herron's] family been victimized through this case losing him, they've had to sit through this trial with character assassination of Kinara Herron who wasn't even allowed to be a witness, so please think about the fairness of that."

Id. The state appellate court further found that, even assuming the prosecutor's commentary improperly appealed to the jury's sympathy, no prejudice resulted because the comments "were relatively brief, and were not inflammatory." Id. Furthermore, the state appellate court noted that the jury was instructed that it should not allow sympathy to influence its decision and that statements of counsel were not evidence. Id. The court found that, in these circumstances, there was "no basis to conclude the jury would have reached a different conclusion in their absence." Id. (citing People v. Fields, 35 Cal. 3d 329, 363 (1983) (finding that a graphic description of victim's sufferings during events leading up to murder and invitation for jurors to think of themselves as the victim were improper, though not prejudicial when considered in context)).

### 2. Analysis

As discussed above, the state appellate court carefully examined Petitioner's prosecutorial misconduct claims and reasonably determined that there was no misconduct. The court also reasonably concluded that any prejudice to Petitioner was harmless. Moreover, the Darden factors—which are used to assess whether the prosecutor's misconduct rises to the level of a due process violation—weigh against Petitioner. In assessing whether a prosecutor's misconduct rises to the level of a due process violation, courts may consider: (1) the weight of evidence of guilt; (2) whether the misconduct was isolated or part of an ongoing pattern, (3) whether the misconduct relates to a critical part of the case, and (4) whether a prosecutor's comment misstates or manipulates the evidence. See Darden, 477 U.S. at 182.

The first Darden factor is not satisfied given the weight of the evidence showing Petitioner's guilt was considerable. See id. Except for Petitioner's testimony that Asidanya was armed, there was no other testimony that anyone other than Petitioner had a gun. There is likewise no evidence that the victim, Herron, had a gun. Further, it was undisputed that no shots were fired at Petitioner or at anyone other than Herron. Although Petitioner insists that he was acting in self-defense, the evidence does not support his claims. To the contrary, the evidence shows that Petitioner fired four shots directly towards Herron, ran

16

away from the home, threw away his gun, and went into hiding. In this case, the jurors clearly understood and followed their instructions when they rejected murder and convicted Petitioner of voluntary manslaughter.

The second Darden factor is not satisfied because the prosecution's challenged acts were isolated and not part of an ongoing pattern. See id. The third Darden factor is not satisfied because the aforementioned acts of alleged prosecutorial misconduct do not relate to a critical part of the case. See id. Finally, as reasonably found by the state appellate court, the prosecutor neither mischaracterized Petitioner's testimony in the first claim, nor misstated or manipulated the evidence in the remaining claims of prosecutorial misconduct. See id.

Even assuming the alleged acts of prosecutorial misconduct resulted in any error, such error was harmless, and did not have a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637. As discussed above, the jury was presented with substantial evidence of Petitioner's guilt. Therefore, the alleged acts of prosecutorial misconduct would not have affected the jury's verdict. The state appellate court's denial of this claim was not objectively unreasonable.

Accordingly, Petitioner has failed to establish that the state appellate court's rejection of his prosecutorial misconduct claims was contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent, or that it was based upon an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(1), (2). Therefore, this claim is DENIED.

C.     **ROMERO CLAIM**

On direct appeal, Petitioner challenged the denial of his motion requesting that the trial court strike his prior strike conviction under Romero. Under Romero, a California sentencing court may, in its discretion, strike a prior felony conviction allegation "in furtherance of justice"—an "amorphous concept" requiring the trial court to consider both "the constitutional rights of the defendant, and the interests of society represented by the People." Id. at 507, 530 (italics omitted).

17

The state appellate court rejected Petitioner's claim as follows:

> Defendant contends the trial court's decision not to strike the prior conviction allegation was improperly based on its view that defendant had not acted in imperfect self-defense or in response to provocation. Even assuming the trial court's decision not to strike the prior conviction arose from this view, our previous conclusions compel us to reject defendant's argument. As we have discussed, the jury did not find that defendant had actually acted in response to provocation or in imperfect self-defense, but only that the prosecution had not met its burden of proving murder beyond a reasonable doubt, and the trial court could permissibly take into account evidence related to the crime of which defendant was convicted in making its sentencing decision. ([Citation.]) Nothing in this record required the trial court to conclude that defendant was outside the spirit of the three strikes scheme, and we discern no abuse of discretion.

Shoemaker, 2009 WL 4190182, *9 (citations omitted).

Whether or not the trial court correctly applied its discretion in denying Petitioner's Romero motion is a matter of state, not federal, law. Brown v. Mayle, 283 F.3d 1019 (9th Cir. 2002), overruled on other grounds, 538 U.S. 901 (2003) (a trial court's refusal to exercise its discretion and strike prior felony convictions is not cognizable on federal habeas review). State law claims are not remediable on federal habeas review, even if state law was erroneously interpreted or applied. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011). Accordingly, the Court finds that Petitioner's Romero claim is not cognizable, and this claim is DENIED.

## IV.  CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set forth above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

## V.  CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. All claims alleged in the Amended Petition are DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall enter judgment, terminate any pending matters, and close the file.

IT IS SO ORDERED.

Dated: 1/20/16

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

P:\PRO-SE\SBA\HC.11\Shoemaker2674.denyHC-final_gina.docx